# EXHIBIT A

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| In the Matter of the Search of | )  |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| a residence located at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034, more particularly described in Attachment A | ) |

Case No. 3:13·mj·1245·MCR

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
a residence located at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034, more particularly described in Attachment A,

located in the _____Middle_____ District of _____Florida_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252 | Receipt and distribution of material involving the sexual exploitation of minors |
| 18 U.S.C. § 2252A | Receipt, distribution and possession of material containing child pornography |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Anthony Algozzini, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___11/14/13___

_____
MONTE C. RICHARDSON
*Judge's signature*

City and state:  Jacksonville, Florida

United States Magistrate Judge
*Printed name and title*



## ATTACHMENT A

## <u>PREMISES TO BE SEARCHED</u>

The premises to be searched is located at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034.  The residence is a one story home located on the west side of Sunny Parke Circle.  The exterior of the residence is comprised of red brick and a gray roof. The numbers "33329" are posted horizontally above and to the right of the three-car garage.   The back yard is fenced in by a black metal fence.   There is a mailbox on the property with the numbers "33329" displayed horizontally below the mailbox.  There are no other premises in the immediate area that match this description.

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED AND SEARCHED**

1.      Any and all computer(s), computer hardware, computer software, electronic storage media (including without limitation any and all disk drives, compact disks, flash drives, cellular telephones, personal digital assistants (PDA), digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to:   visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs, including, but not limited to, P2P software, that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, email messages,

chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including, but not limited to, the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages,

2

chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital-data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

11.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or

3

other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all cameras, film, videotapes or other photographic equipment.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct,  as defined in 18 U.S.C. § 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

4



## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Anthony Algozzini, Special Agent, Homeland Security Investigations, Jacksonville, Florida, being duly sworn, do state the following:

### INTRODUCTION

1.      I am a Special Agent (SA) with Homeland Security Investigations, formerly U.S. Immigration and Customs Enforcement (ICE) and formerly U.S.  Customs Service.  I am currently assigned to the Jacksonville, Florida office.  I have been so employed since May of 2003.  I have attended the Criminal Investigator Training Program and ICE Special Agent Training Academy at the Federal Law Enforcement Training Center in Brunswick, Georgia.  I am classified and trained as a Federal Law Enforcement Officer, with federal statutory arrest authority.  In my capacity as a Special Agent I have participated in numerous types of investigations, during the course of which I have conducted or participated in physical surveillance, undercover transactions, executions of search and arrest warrants, controlled delivery transactions of narcotics and other contraband, asset forfeiture including real property, and other complex investigations.

2.      I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children which constituted violations of Title 18, United States Code, Sections 2252 and 2252A, as well as Florida state statutes which criminalize the possession, receipt and transmission of child pornography, that is, visual images depicting minors engaged in sexually explicit conduct.  I have received training from HSI regarding the investigation of crimes against children, including the receipt, transportation, distribution, and possession of child pornography.



3.       The statements contained in this affidavit are based on my personal knowledge as well as on information provided to me by other law enforcement officers. This affidavit is being submitted for the limited purpose of securing a search warrant, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause to believe evidence of violations of Title 18, United States Code, Sections 2252 and 2252A, is present in the premises and items to be searched.

## STATUTORY AUTHORITY

4.       This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors.  Based upon my training and experience, I know the following:

a.       18 U.S.C. § 2252(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing or accessing with intent to view any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails.

b.       18 U.S.C. § 2252A(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer.

c.       18 U.S.C. § 2252(a)(1) prohibits a person from knowingly

2

transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails, any visual depiction of minors engaging in sexually explicit conduct.   Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by any means including by computer, any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or that has been mailed or shipped or transported in or affecting interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails.  Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to knowingly possess or knowingly access with intent to view, one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in and affecting interstate or foreign commerce, or which were produced using materials which have been mailed or so shipped or transported, by any means including by computer.

      d.    18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography.   18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly

receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.   18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mails or in or affecting interstate or foreign commerce by any means, including by computer.   18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5.     The following definitions apply to this Affidavit:

a.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

b.     "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where

4

(a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct). See 18 U.S.C. §§ 2252 and 2256(2).

      c.    "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format.  See 18 U.S.C. § 2256(5).

      d.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18 U.S.C. § 2256(2).

      e.    "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

      f.    "Computer hardware," as used herein, consists of all equipment

5

which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.      "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

h.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs),

memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

   i.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

   j.  "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a unique and different number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.


### COMPUTERS AND CHILD PORNOGRAPHY

  6.  Based upon my training and experience, as well as conversations with

other experienced law enforcement officers and computer forensic examiners who investigate cases involving the sexual exploitation of children, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.   In the past, child pornography was produced using cameras and film (either still photography or movies).   The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.   There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks.   The photographs themselves were somewhat bulky and require secure storage to prevent their exposure to the public and/or law enforcement. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

7.      The development of computers has radically changed the way that child pornographers obtain, distribute and store their contraband.   Computers basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

8.      Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner.   Moreover, with the advent, proliferation and widespread use of digital cameras, the images can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device1.   Digital cameras

---

1      I know that in a 2007 case filed in the Jacksonville Division of the Middle

have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and videos. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

9.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high resolution.

10.   The World Wide Web of the Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

11.   Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo!, Hotmail, and Google, among others. The online services allow

---

District of Florida, FBI Special Agent Lawrence Meyer executed a federal search warrant at a residence and several computer hard disk drives were seized. Many images and videos of child pornography were discovered on these hard disk drives. Forensic analysis of these hard disk drives revealed that the owner (defendant) had converted 15-year-old Polaroid photographs depicting child pornography into digital images by scanning them onto his computer. Moreover, the analysis revealed that the owner (defendant) had made VHS videotapes containing child pornography, and then years later displayed them on a large flat screen monitor and filmed the monitor with a digital camera. Thus, the owner (defendant) successfully converted traditional photos and videos into digital photographs and videos that could be stored and easily traded over the Internet.

9



a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

12.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files. Digital information, images, and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users which have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based on my training and experience, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they record communications in transcript form, show the date and time of such communications, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic

10



communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded.  Such information is often maintained on a computer for long periods of time until overwritten by other data.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

13.    Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that searches and seizures of evidence from computers commonly require investigators to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following:

a.    Computer storage devices (such as hard drives, compact discs [CDs], diskettes, tapes, and others) can store the equivalent of thousands of pages of information.  Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.  This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on

11



a.      Many individuals who traffic in and trade images of child pornography also collect child pornography.  Many individuals who collect child pornography have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

b.      Many individuals who collect child pornography collect sexually- explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.  Most of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

c.      Many individuals who collect child pornography often seek out like minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support.  This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior.  The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P), email, email groups, bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

d.      Many individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding

13

comfort for their illicit behavior and desires.  Such individuals often do not destroy these materials because of the psychological support that they provide.

      e.     Many individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests.  These contacts are maintained as a means of personal referral, exchange or commercial profit.  These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

      f.     Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage.  These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet.  As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations.  The known desire of such individuals to retain child pornography together with the sense of security afforded by using computers, provides probable cause to believe that computer images, especially child pornography and erotic nudity involving minors, may be retained by the collector indefinitely.  These individuals may protect their illicit materials by passwords, encryption, and other security measures, save it on movable media such as CD's, DVD's, flash memory, thumb drives, and removable hard drives, which can be very

small in size, including as small as a postage stamp, and easily secreted, or send it to third party image storage sites via the Internet.  Based on my training and experience, as well as my conversations with other experienced law enforcement officers, I know that individuals who possess, receive, and/or distribute child pornography by computer using the Internet often maintain and/or possess the items listed in Attachment B.

15.     As stated in substance above and based upon my training and experience as well as my conversations with other experienced law enforcement officers who investigate cases involving the sexual exploitation of children, I know that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials.   For example, during the course of an investigation in 2007 in the Middle District of Florida conducted by Special Agent (SA) Veronica B. Edwards, with the Florida Department of Law Enforcement (FDLE) Cyber/High Tech Crimes Unit, the subject had his residence searched pursuant to a federal search warrant and his computer and digital storage media seized by the FBI.  The search of his computer and other computer storage media revealed the subject knowingly possessed several thousand images of child pornography.   The subject retained an attorney and both were made aware of the ongoing investigation into the subject's commission of federal child pornography offenses.  Approximately two months later, the subject was arrested on federal child pornography possession charges.  After the subject's arrest, the FBI obtained a laptop computer owned by the subject's employer but possessed and used by the subject both before and after the execution of the search warrant at his residence.   Subsequent

15

forensic examination of this computer revealed that the subject had downloaded, possessed and viewed images of child pornography numerous times *after* the execution of the search warrant and before his arrest.

## PEER-TO-PEER (P2P) FILE
## SHARING AND EDONKEY MD4 ROOT HASH VALUE FILE IDENTIFICATION

16.     A common means of sharing image and video files on the Internet is peer-to-peer file sharing (hereinafter referred to as "P2P").   P2P file sharing is a method of communication available to Internet users through the use of special software programs. P2P file sharing programs allow groups of computers using the same file sharing network and protocols to transfer digital files from one computer system to another while connected to a network, usually on the Internet.   There are multiple types of P2P file sharing networks on the Internet currently operating, one of these being the "eDonkey network" (hereinafter referred to as "eDonkey").   To connect to a particular P2P file sharing network, a user first obtains a P2P client software program for a particular P2P file sharing network, which can be downloaded from the Internet.   A particular P2P file sharing network may have many different P2P client software programs that allow access to that particular P2P file sharing network or multiple P2P file sharing networks.   These P2P client software programs share common protocols for network access and file sharing.   The user interface, features, and configurations may vary between clients and versions of the same client.

17.     While examining P2P file sharing networks, I have learned that P2P client software is publicly available software that allows the user to set up file(s) on a computer to be shared on a P2P file sharing network with other users running compatible P2P client software.   A user can also obtain files, whether pictures, movies,

16

or other digital files, by opening the P2P client software on the user's computer and conducting a search for files that are of interest and currently being shared on a P2P file sharing network.

18.    I know from training and experience and conversations with other law enforcement officers that P2P file sharing networks, including the Gnutella and eDonkey networks, are frequently used to trade digital files of child pornography.   These files include both image and movie files.

19.    Many P2P file sharing networks are designed to allow users to download files and frequently provide enhanced capabilities to reward the sharing of files by providing reduced wait periods, higher user ratings, or other benefits.   In some instances, users are not allowed to download files if they are not sharing files.   Typically, settings within these programs control sharing thresholds.

20.    With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world.   This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods.

21.    When the P2P software is installed on a computer, the user is directed to specify a "shared" folder.  All files placed in that user's "shared" folder are available to anyone on the world-wide network for download.   Most P2P software gives each user a rating based on the number of files he/she is contributing to the network.  This rating affects the user's ability to download files.  The more files a user is sharing, the greater his/her ability is to download files.  This rating system is intended to encourage users to

17

"share" their files, thus propagating the P2P network.  However, a user is not required to share files to utilize the P2P network

22.    A user obtains files by conducting keyword searches of the P2P network. When a user initially logs onto the P2P network, a list of the files that the user is sharing is transmitted to the network.  The P2P software then matches files in these file lists to keyword search requests from other users.  A user looking to download files simply conducts a keyword search.  The results of the keyword search are displayed and the user then selects file(s) which he/she wants to download.  The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) hosting the file.  Once a file has been downloaded, it is stored in the area previously designated by the user and will remain there until moved or deleted.  Most of the P2P software applications keep logs of each download event.  Frequently, a computer forensic examiner, using these logs, can determine the Internet Protocol ("IP") address from which a particular file was obtained.

23.    Thus, a person interested in sharing child pornography with others in the P2P network, need only place those files in his/her "shared" folder(s).  Those child pornography files are then available to all users of the P2P network for download regardless of their physical location. For instance, a person interested in obtaining child pornography can open the P2P application on his/her computer and conduct a keyword search for files using a term such as "preteen sex."  The keyword search would return results of files being shared on the P2P network that match the term "preteen sex."  The user can then select files from the search results and those files can be downloaded

18

directly from the computer(s) sharing those files.

24.     One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel.  This means that the user can download more than one file at a time.  In addition, a user may download parts of one file from more than one source computer at a time.  For example, a user downloading an image file may actually receive parts of the image from multiple computers.  This reduces the time it takes to download the file. A P2P file transfer is assisted by reference to an IP address.  This address, expressed as four numbers separated by decimal points, is unique to a particular Internet connection during an online session.  The IP address provides a unique location making it possible for data to be transferred between computers.

25.     Even though the P2P network links together computers all over the world and users can download files, it is not possible for one user to send or upload a file to another user of the P2P network.  The software is designed only to allow files to be downloaded that have been selected.

26.     Based on my conversations with HSI Special Agent Jimmie Morand and Jacksonville Sheriff's Office (JSO) Detective Sherry Ann Torres-Dror, both of them being law enforcement officers who have training and experience in investigating child pornography, the following was relayed to me about the operation of the eDonkey file-sharing network, one of several P2P networks, and the subject of this investigation:

a. The eDonkey network is also known as the eDonkey2000 file-sharing network, or eD2k.  Users of this network can simultaneously provide files to users while downloading files from other users.

19

b. The eDonkey network can be accessed by computers running several different client programs.  These programs share common protocols for network access and file sharing.   The user interface, features and configuration may vary between clients and versions of the same client.

c. During the default installation of an eDonkey client, settings are established which configure the host computer to share files.   Depending upon the eDonkey client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed.

d. Typically, a setting establishes the location of one or more directories or folders whose files are made available for distribution to other eDonkey users.

e. Typically, a setting controls whether or not other users of the network can obtain a list of the files being shared by the host computer.

f.  Typically, a setting controls whether or not users will be able to share portions of a file while they are in the process of downloading the entire file.   This feature increases the efficiency of the network by putting more copies of file segments on the network for distribution.

g. Files on the eDonkey network are uniquely identified using MD42 (or Message-Digest Algorithm) root hash of a MD4 hash list of the file.  This

---

2 The MD4 is a cryptographic hash function developed by Ronald Rives in 1990.  The digest length is 128 bits.

treats files with identical content but different names as the same, and files with different contents but the same name as different.

h. Files located in a user's shared directory are processed by the client software.  As part of this processing, a MD4 root hash value is computed for each file in the user's shared directory.

i. The eDonkey network uses MD4 root hash values to improve network efficiency.  Users may receive a selected file from numerous sources by accepting segments of the file from multiple users and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file.  The network uses MD4 root hash values to ensure exact copies of the same file are used during this process.

j. The eDonkey software allows the user to search for pictures, movies, and other files by entering descriptive text as search terms.  These terms are typically processed by peers based upon the information about the files that had been sent by individual users.

k. Entering search terms into an eDonkey client returns a list of files and descriptive information including, in some client software, the associated MD4 root hash values.

l. A person is able to compare the MD4 root hash values of files being shared on the network to previously identified MD4 root hash values of

any file, including child pornography.   Using a publicly available eDonkey client, a user can select the MD4 root hash value of a known file and attempt to receive it.   A review of the MD4 root hash signatures allows an investigator to identify the files that are child pornography.   Once a specific file is selected, the download process can be initiated.   Once initiated, a user is presented with a list of users or IP addresses that have recently been identified as download candidates for that file. This allows for the detection and investigation of computers involved in possessing, receiving and/or distributing files of previously identified child pornography.

m. Internet computers identify each other by an IP address.   IP addresses can assist law enforcement in finding a particular computer on the Internet.   IP addresses can typically lead the law enforcement officer to a particular Internet service company and that company can typically identify the account that used the IP address to access the Internet.

n. The IP addresses can be used to identify the location of these computers.  The returned list of IP addresses can include computers that are likely to be within this jurisdiction.   The ability to identify the approximate location of these IP address is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection. At this point in the investigative process, a recent association between a known file (based upon MD4 root hash comparison) and a computer having

22

a specific IP address (likely to be located within a specific region) can be established.

o. Once this association has been established, an investigator can attempt to download the file from the associated user or view the contents of the shared directory.   Depending upon several factors, including configuration and available resources, it might not be possible to do either.

p. Depending on the associated user configuration and available peer resources, a listing of the files being shared may be displayed.   In order to obtain this list of files, a direct connection between the computers must occur.   This list can be a partial listing of the shared files.   The file list can *only* be obtained if the associated peer is connected to the network and running an eDonkey client at that moment.

q. By receiving either a file list or portions of a download from a specific IP address, the investigator can conclude that a computer, likely to be in this jurisdiction, is running an eDonkey client and possessing, receiving and/or distributing specific and known visual depictions of child pornography.

27.    Based on my training and experience, as well as conversations with other experienced law enforcement officers, I know that cooperating police agencies pool their information to assist in identifying criminal conduct and build probable cause to further criminal investigations.   Many of the officers involved in this effort are using the technology and methods described herein.   With this pooled information, law enforcement officers may obtain a better understanding of the global information

23

available about a suspect that resides within their geographic area of jurisdiction. Given the global scope of the Internet, this information is valuable when trying to establish the location of a suspect. Investigators from around the world gather and log information, which can be used by an investigator to establish probable cause for a specific investigation in his or her jurisdiction.

## BACKGROUND OF INVESTIGATION AND
## FACTS ESTABLISHING PROBABLE CAUSE

28.    I make this affidavit in support of a search warrant for the residence located at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034, currently occupied by John Dewey Todd (date of birth October 22, 1953). I have personally observed the premises, and it appears as set forth in Attachment A. Nassau County Sheriff's Office (NCSO) Detective W. Herrington took digital photographs of the residence on October 31, 2013, and the photographs are consistent with the description as set forth in Attachment A.

29.    HSI-Jacksonville is investigating John Dewey Todd as a suspect for using one or more computers and computer media at this premises to commit violations of Title 18, United States Code, Sections 2252 and 2252A, which prohibit mailing, transportation, shipment, receipt, possession and access with intent to view, in interstate or foreign commerce by any means, including by computer, any child pornography.

30.    On November 5, 2013, I spoke with JSO Detective Sherry Ann Torres-Dror regarding the background of this investigation and the facts establishing probable cause. Det. Torres-Dror has been employed by the JSO for more than 9 years. She is

24

currently assigned to JSO's Homeland Security Division as a member of the North Florida Internet Crimes Against Children (ICAC) Task Force in Jacksonville, Florida. ICAC is a national organization which provides specialized high-technology training and resources to law enforcement agencies that investigate crimes dealing with the online sexual solicitation and sexual exploitation of children, including the collection and trading of images of child pornography. She has attended several training courses regarding the investigation of Internet crimes against children and computer crimes and has conferred with others who have similar experience conducting such investigations. The following is a list of courses in which she has received training and has gained a level of proficiency:   ICAC Investigative Techniques; ICAC Undercover Chat Investigations; ICAC Online Ads; Basic Computer Skills for Law Enforcement; and Identifying and Seizing Electronic Evidence. She has also received peer-to-peer (P2P) training and has been licensed to conduct investigations involving the Child Protection System (CPS) and RoundUp eMule (both dealing specifically with the investigation of child pornography distribution through the use of P2P computer networks). She has an understanding of the Internet and has conducted and participated in investigations involving undercover chat sessions, child sexual solicitation, and the receipt, transportation, distribution, and possession of child pornography. She has been involved in searches pertaining to the possession, collection, production, and/or transportation of child pornography through either the execution of search warrants or through the subject providing written consent for such a search. She holds a Bachelor of Science in Psychology and a Bachelor of Arts in Criminology from the University of



Florida.  She received basic law enforcement training from the North Florida Criminal Justice Training Center in Jacksonville, Florida, and has attended advanced training and seminars in general criminal investigations, Sex Crimes investigation, interdiction, organized crime, and Narcotics investigations.  She has investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children which constituted violations of Title 18, United States Code, Sections 2252 and 2252A, as well as Florida state statutes which criminalize the possession, receipt and transmission of child pornography, that is, visual images depicting minors engaged in sexually explicit conduct.

31.  On November 5, 2013, I met with Det. Torres-Dror, who relayed the following background of this investigation and the facts establishing probable cause:

a.  On June 10, 2013, JSO Det. Gary Snyder began an undercover operation to identify persons using the eDonkey P2P network on the internet to receive, traffic in, share and/or distribute images of child pornography.  Det. Snyder was investigating host computers located in northern Florida that were actively sharing child pornography on the Gnutella or eDonkey P2P network.  Through the use of specialized law enforcement software, Det. Snyder confirmed that a host computer using a particular IP address in Florida was hosting and offering for distribution ("sharing") files of at least one minor engaged in sexually explicit conduct.[3]  Specifically, he viewed a list

---

[3]     Det. Torres-Dror has learned from talking with law enforcement officers who investigate crimes involving the sexual exploitation of children, that searching on a P2P network as described above results in an investigator receiving a list of IP addresses identifying locations where a computer has P2P software installed, and individual files have been reported as available for download with a specific digital

of approximately three hundred eighty-five (385) file names that were identified by law enforcement software tools to be available for downloading from the host computer using the IP address 71.203.187.2 during the period from September 1, 2012 – May 16, 2013.    Det. Snyder conducted an Internet search on the origin of the IP address 71.203.187.2, and determined that this IP address was issued to Comcast Cable Communications.

      b.     On June 19, 2013, Det. Snyder caused an Administrative Summons to be served to Comcast Cable Communications for the subscriber records of the account to which the IP address 71.203.187.2 was assigned on May 8, 2013, at 08:59 GMT, a specific time when one of the files on the list was available for downloading from the host computer.  The response disclosed the following information about the subscriber for the IP address 71.203.187.2:

---

signature (such as eDonkey MD4).    Det. Torres-Dror has also learned that an investigator can, by comparison of the digital signatures, conclude that a computer, originating from an IP address has P2P software installed on it, and the computer contains images of child pornography.

27



Subscriber Name:    John Todd

Service Address:    33329 Sunny Parke CIR

Fernandina Beach, FL 32034-8194

Telephone number:  904-753-1531

Type of Service:    High Speed Internet Service

Account Number:    8495744010088167

Account Status:    Active

Account Created:    12/10/2011

IP Assignment:    Dynamically Assigned

E-mail User Ids:    mtzlplk18

(the above user ID(s) end in @comcast.net)

Method of payment: Statement sent to above address

Current IP:    71.203.187.2 as of June 20, 2013

c.    On September 20, 2013, Det. Torres-Dror continued the ongoing criminal investigation of John Dewey Todd as a suspect for using one or more computers and computer media at this premises to commit violations of Title 18, United States Code, Sections 2252 and 2252A, which prohibit mailing, transportation, shipment, receipt, possession and access with intent to view, in interstate or foreign commerce by any means, including by computer, any child pornography.

d.    On October 31, 2013, Det. Torres-Dror conducted a query of the State of Florida Drivers and Vehicle Identification Database (DAVID) which indicates the residence located at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034, is the address on record for John Dewey Todd.  The DAVID database also showed that Todd

28



has registered to him a 2011 brown Chevrolet, Florida license plate L301TT, and a 2008 gray Nissan, Florida license plate N201JL, which is also registered to Sheila Lynn Todd, who also resides at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034.

   e. On October 31, 2013, at some point between the hours of 11:15 AM and 2:00 PM, NCSO Detectives R. McConnell and W. Herrington conducted surveillance at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034.  They observed both of John Dewey Todd's registered vehicles described herein parked at the residence.

   f. On October 31, 2013, Det. Torres-Dror had the address of 33329 Sunny Parke Circle, Fernandina Beach, FL 32034, cross-referenced with the Jacksonville Electric Authority's (JEA) database.  Customer service records from the database were provided to her by NCSO Det. McConnell and revealed that the customer on record for 33329 Sunny Parke Circle, Fernandina Beach, FL 32034, is John D. Todd.

   g. On November 5, 2013, Det. Torres-Dror cross-referenced the address of 33329 Sunny Parke Circle, Fernandina Beach, FL 32034 with the Nassau County Property Appraiser database.  The owners on record for 33329 Sunny Parke Circle, Fernandina Beach, FL 32034, are John D. Todd and Sheila L. Todd.

   h. On November 5, 2013, through the use of specialized law enforcement software, Det. Torres-Dror viewed a list of approximately four hundred forty-six (446) file names that were available for downloading from the host computer using the IP address 71.203.187.2 during the period from September 1, 2012 – November 4, 2013.



i.      The data provided by the law enforcement software that Det. Torres-Dror used indicated that 446 of the images and/or videos being hosted by the computer using IP address 71.203.187.2 have previously been designated by other experienced investigators as being suspected child pornography.  In addition, many of these files have titles that contain terms that are indicative of child pornography. Although file titles are not always reliable to determine the exact contents of a specific file, the possession of numerous files with similar titles is highly suggestive that a significant portion of the files likely depict child pornography.    Since the files downloaded by the user(s) of this host computer were located by placing search terms into the eDonkey program, the fact that these terms appear repeatedly suggests the user was looking for such files.    For example, the titles of child pornography images and videos frequently contain the term "PTHC."[4]  A significant number of the files that Det. Torres-Dror observed being present on the computer using IP address 71.203.187.2 contain the term "PTHC."  Other such terms typically associated with child pornography images and/or videos are "Pedo," "BabyJ," "R@ygold," and "Babyshivid," among others.

j.      For each of the 446 listed files, the unique eDonkey MD4 values and specific IP address of 71.203.187.2 were listed by the law enforcement software that Det. Torres-Dror used.  As described herein, these eDonkey MD4 values each

---

[4]      Det. Torres-Dror knows from training and experience that this is an acronym for "Pre-Teen Hard Core."  Det. Torres-Dror also knows that collectors of child pornography often use this term to search the Gnutella and eDonkey networks for images or videos that depict child pornography.

30

correspond to an image contained on the list of those known[5] or notable[6] images of

child pornography and catalogued by the National Center for Missing and Exploited

Children (NCMEC) and/or the Internet Crimes Against Children Task Force (ICAC[7])

     k.    On November 5, 2013, Det. Torres-Dror reviewed the list of files

that had been offered for distribution between the dates of September 1, 2012 –

November 4, 2013.  To confirm the content of these files, Det. Torres-Dror referenced

her law enforcement library of known movies or images of child pornography and

located six (6) identical files with the identical known eDonkey MD4 values.  Based on

her training and experience, she believes each of these six files, which were present on

---

[5]    Based on her training and experience, as well as conversations with experienced law enforcement officers, Det. Torres-Dror knows that the National Center for Missing and Exploited Children (NCMEC) is a private, nonprofit organization which was created in 1984.  The mission of NCMEC is to serve as the nation's resource on the issues of missing and sexually exploited children.  NCMEC provides information and resources to law enforcement, parent, and children, as well as other professionals.  NCMEC also maintains a repository of images and videos of child pornography which depict both known as well as unidentified child victims of sexual abuse.  When a child victim is positively identified, NCMEC maintains this information and assists in the notification of the victim and law enforcement in subsequent investigations.

[6]    Based on her training and experience, as well as conversations with experienced law enforcement officers, Det. Torres-Dror knows that each of these files has been viewed by one or more law enforcement officers trained to investigate child pornography, and this officer has chosen to designate such file as "child notable," referring to the fact that the child(ren) depicted appear to be under the age of 18 years.

[7]    Based on her training and experience, Det. Torres-Dror knows that the ICAC Task Force Program was created by the Office of Juvenile Justice and Delinquency Prevention under the authority of the 1998 Justice Appropriations Act, Public Law 105-119.  The purpose of the ICAC Task Force Program is to help state and local law enforcement agencies develop an effective response to cyber enticement and child pornography cases that encompasses forensic and investigative components, training and technical assistance, victim services, and community education.

the computer using IP address 71.203.187.2 and being offered for sharing, depicts at least one minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to Title 18, United States Code, Sections 2252 and 2252A. Described below are two (2) of these six files that Det. Torres-Dror observed and were present on the computer using IP address 71.203.187.2 and were being offered for sharing from the computer using IP address 71.203.187.2 on the date and times listed below:

HASH VALUE:     49F655A5BC69BF92C4FA84EC708844D3

DATE:     10/10/2012 8:33 GMT

TITLE:     "(Kleuterkutje) (Hussyfan) (Pthc) Dark Secret~Very Willing Little Girls 4Yo To 7Yo.avi"

DESCRIPTION:     This video file was approximately 21 minutes and 16 seconds in length and consisted of a compilation of multiple scenes.  The first video segment displayed a young prepubescent female child wearing nothing but underwear and a necklace and rubbing her hands over her body, including over her vaginal area. The girl pulled down her underpants, faced away from the camera, and bent over, which exposed her buttocks and vaginal area to the camera.   The camera then focused on the girl using her fingers to spread open her vagina.   The girl then turned around to stand before the camera.  She used her hands to rub her body, including her vagina. The next video segment showed a close-up of an adult male's penis penetrating a prepubescent female child's vagina.  The next scene was of an adult male's penis on top of a prepubescent female child's vagina, with both the penis and vagina covered in what looked like semen.  The video continued with the girl rubbing the semen over her body with her hand and briefly masturbating.   The remaining scenes in the video

32

involved various sexual acts with prepubescent females, including the following: vaginal intercourse between an adult male and a prepubescent female; an adult male ejaculating on a prepubescent female's body; anal sex between an adult male and a prepubescent female; an adult digitally penetrating a prepubescent female's vagina and anus; a prepubescent female digitally penetrating her own vagina; an adult inserting a Sharpie pen into a prepubescent female's vagina, while the girl appeared to have red rope tied around her genital and buttocks areas; and a prepubescent female, whose legs were bound by a light-colored fabric, having vaginal and anal intercourse with an adult male, who also digitally penetrated her vagina.   Some of these scenes were illuminated by a flashlight-type of lighting source.  Since the camera was mainly focused on the genitals, it was difficult to determine when one segment ended and the next started. All of the females in the video appeared to be prepubescent.

> HASH VALUE:      444D415E157236AA686E5D3C399992F2
>
> DATE:               10/14/2012 4:19 GMT
>
> TITLE:               "Pedoland Vid4.mpg"
>
> DESCRIPTION:      The video was approximately 2 minutes and 7

seconds in length.  The video depicted a prepubescent female child performing oral sex on an adult male penis.  The male was supine, naked from the waist down, and with his legs spread apart.  The girl lay prone between his legs wearing only dark socks.  The male later directed the girl to change positions, and she complied by moving so that she was alongside him with her head near his penis.  The second scene displayed the male masturbating and then ejaculating into the child's mouth.

33



I.      Based upon her training and experience, as well as her review of these videos, Det. Torres-Dror has probable cause to believe both of these videos depict minors engaged in sexually explicit conduct, and therefore constitute child pornography pursuant to Title 18, United States Code, Section 2256.

## CONCLUSION

32.     Based on the foregoing, I have probable cause to believe that one or more individuals has used and is using one or more computers and/or electronic storage media located in the residence at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034, more fully described in Attachment A to this affidavit, to, among other things, receive and possess child pornography.  Therefore, I have probable cause to believe that one or more individuals, using the residence described above has violated 18 U.S.C. §§ 2252 and 2252A.  Additionally, I have probable cause to believe that fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, including at least one computer and other electronic storage media containing images of child pornography, and the items more fully described in Attachment B to this affidavit (which is incorporated by reference herein), will be located in this residence.

34



33.    Accordingly, I respectfully request a search warrant be issued by this Court authorizing the search and seizure of the items listed in Attachment B.


ANTHONY F. ALGOZZINI, Special Agent
Homeland Security Investigations


Subscribed and sworn to before me this
_____ day of November, 2013, at Jacksonville, Florida.


MONTE C. RICHARDSON
United States Magistrate Judge

35

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

The premises to be searched is located at 33329 Sunny Parke Circle, Fernandina Beach, FL 32034.  The residence is a one story home located on the west side of Sunny Parke Circle.  The exterior of the residence is comprised of red brick and a gray roof. The numbers "33329" are posted horizontally above and to the right of the three-car garage.  The back yard is fenced in by a black metal fence.  There is a mailbox on the property with the numbers "33329" displayed horizontally below the mailbox.  There are no other premises in the immediate area that match this description.

1



**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED AND SEARCHED**

1.      Any  and  all  computer(s),  computer  hardware,  computer  software,
electronic storage media (including without limitation any and all disk drives, compact
disks,  flash  drives,  cellular  telephones,  personal  digital  assistants  (PDA),  digital
cameras and/or memory cards, or any other device capable of electronic storage of
data  and/or  images),  computer-related  documentation,  computer  passwords  and
data-security  devices,  videotapes,  video-recording  devices,  video-recording  players,
and  video  display  monitors  that  are  or  may  be  used  to:    visually  depict  child
pornography  or  child  erotica;  display  or  access  information  pertaining  to  a  sexual
interest in child pornography; display or access information pertaining to sexual activity
with  children;  or  distribute,  possess,  or  receive  child  pornography,  child  erotica,  or
information pertaining to an interest in child pornography or child erotica.

2.      Any  and  all  computer  software,  including  programs  to  run  operating
systems,  applications,  such  as  word  processing,  graphics,  and  communications
programs,  including,  but  not  limited  to,  P2P  software,  that  may  be  or  are  used  to:
visually  depict  child  pornography  or  child  erotica,  display  or  access  information
pertaining  to  a  sexual  interest  in  child  pornography;  display  or  access  information
pertaining  to  sexual  activity  with  children;  or  distribute,  possess  or  receive  child
pornography,  child  erotica,  or  information  pertaining  to  an  interest  in  child  pornography
or child erotica.

3.      Any and all notes, documents, records, or correspondence, in any format
and medium (including, but not limited to, envelopes, letters, papers, email messages,

1

chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.     In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.     Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including, but not limited to, the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages,

2



chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital-data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

11.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or

3

other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all cameras, film, videotapes or other photographic equipment.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct,  as defined in 18 U.S.C. § 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

4