IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

V.   CASE# 3:14-CR-11-J-39JRK

JOHN DEWEY TODD.

## EMERGENCY MOTION FOR RECONSIDERATION OF COMPASSIONATE RELEASE BASED ON MATERIAL CHANGES IN CIRCUMSTANCE

I. INTRODUCTION

Comes now, John Dewey Todd, pro se, hereafter "defendant" in this above styled action hereby respectfully requesting emergency re-consideration of Compassionate Release based on material changes in circumstance. The defendant further requests that this court recognize the finding(s) as contained within Loren v. Sasser, 309 F. 3d 1296, 1301 (11th Cir. 2002), asserting that "...courts still must construe pro se pleadings more liberally than those of a party represented by an attorney".

II. STATEMENT OF JURISDICTION

The United States District Court retains original jurisdiction under 18 U.S.C. 3582(c)(1)(A) as amended by the First Step Act of 2018.

Further the defendant has exhausted all available remedies prior to the creation of this instrument and filing thereof, equally providing current jurisdiction over this matter.

The defendant for cause, as will be demonstrated herein, respectfully requests Emergency Consideration of this instrument as available under Local Rule 3.01(e), "Motions and Other Legal Memorandums". Further, and after researching applicable legal principles, the defendant certifies that this Emergency Motion For Reconsideration Of Compassionate Release Based On Material Changes In Circumstance, inclusive of any adopted material previously filed, the entirety of the record in the instant matter, and inclusive of any attachment(s) thereto, does in fact present a true emergency (as opposed to a matter that may only need expedited treatment) and requires an immediate ruling because the court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of any extended period. As such, and per the jurisdiction as granted under this above captioned local rule, the

defendant herein requests a ruling within ten (10) days.

## III. ARGUMENT

### A. EXTRAORDINARY AND COMPELLING REASONS EXIST

1. The defendant here adopts his previously filed Motion for Compassionate Release, [D.E. 50], and reiterates the court's previous assumption that he qualifies and has previously met the "Extraordinary and Compelling" prong of the requirements. None the less however, the defendant asserts the following conditions and citations in reference to the support of the same as the current state of the art in the science behind the pandemic has broadened, thus creation even further validation of the grave circumstances to which the defendant faces every moment that he is incarcerated.

2. The defendant previously worked in the asbestos field and the same now constitutes an increased risk to him in the event that he would acquire Covid-19 and or any of the variants thereof. It is cited specifically that "...asbestos...workers themselves have a MUCH HIGHER RISK FOR DEVELOPING SEVERE COMPLICATIONS IF CONTRACTING THE VIRUS" (emphasis added), and continuing to cite "Even low exposure to asbestos can cause severe health problems such as chronic shortness of breath, pulmonary fibrosis, lung cancer, and mesothelioma, a form of cancer caused only by exposure to asbestos. Those ALREADY DIAGNOSED [such as the defendant herein] with an asbestos related disease or breathing problems are at the highest risk for developing severe complications if contracting the virus" (emphasis added). See https://www.worthingtoncaron.com/news/2020/asbestos-workers-at-higher-risk-for-covid-19-com.aspx

3. The defendant currently suffers from hypertension, diabetes, and cardiovascular disease and it is well established that "diabetes, hypertension, and especially cardiovascular disease are important risk factors for the severity and mortality in Covid-19 infected people and are targets that must be intensively addressed in the management of Covid-19." See https://dmsjournal.biomedcentral.com/articles/10.1186/s13098-020-00586-4#citeas.

In the realm of the defendant's diabetes and the state of the art of world science at current, "it has been suggested that diabetes mellitus is one of the most common comorbities in infected people". Further, it also

(2)

has been settled that a person suffering from diabetes is 226% more likely to have substantially higher severity from a covid-19 infection than those without. See https://link.springer.com/article/10.1007/s40618-020-01236-2. The defendant is prescribed metFORMIN HCl 500MG Tab to which he takes twice daily to assist in controlling his diabetes. It is known that this particular drug further suppresses the defendant's immune system thus exposing him to a higher risk of actually contracting the virus. This predicated additionally on his environment and being incarcerated to which he cannot social distance, shares a dormitory style room with approximately forty five (45) other inmates of varying age and health, and further communal restrooms and shower facilities. This presents an independently unique circumstance to the defendant in his current situation. See https://pubmed.ncbi.nlm.nih.gov/28606032/; see also https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html ("If you have a condition or are taking medications that weakens your immune system, you are NOT fully protected even if you are fully vaccinated.");

see also https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinicalcare/underlyingconditions.html ("...the presence of obesity was associated with an approximately 300% increased risk of having severe Covid-19.").

In the realm of hypertension, it "...is a clinically important risk factor for critical illness and mortality in COVID-19." Such presents to the defendant, at a minimum without age considerations, a 217% higher risk for covid-19 mortality, noting further that male patients have a higher risk than female, and greater than age 60 [such as the defendant] are associated with a significantly increased risk of death from Covid-19. A meta-regression analysis additionally showed that age had a significant influence on the association between hypertension and Covid-19 mortality rates. See https://pubmed.ncbi.nln.nih.gov/33549450/

4. The defendant suffers from high cholesterol. "Covid-19 puts the body in a pro-flammatory state, damaging the heart and lung tissues while also increasing the risk of coaggulopathy or blood clots. Those with high cholesterol and Covid-19 are at even higher risk of experiencing a cardiovascular event". The defendant is further obese, noting his BMI level at 34.50, and independently or in conjunction with high cholesterol levels, it is known that "...you may require more rigorous social distancing or shielding from people to avoid Covid -19 infection and subsequent complications." See https://www.verywellhealth.com/high-cholesterol-and-covid-19-5118092/, see also https://www.cdc.gov/obesity/data/obesity-and-covid-19.html.

5. In a prison setting such as the defendant, it is well established that many inmates experiencing

(3)

symptoms, and even those that are asymptomatic, fail to ever receive tests for multiple reasons, inclusive of fear of segregation and the harsh environment of quarantine in prison coupled with the knowledge that the medical department can do nothing other than provide Tylenol, at best. It is risk versus reward and many inmates will go without testing for this reason alone. This creates a substantial risk to the defendant that can be prevented by this instrument. Further, and in reviewing the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016)(finding that the BOP experienced chronic medical staff shortages, leading to endangering the safety and security of institutions), it is clear that medical care is not as accessible to inmates in the best of times, let alone during this worldwide pandemic. A judge in this circuit recently cited "even without a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases." Matos v.Lopez Vega, No. 20-CIV-60784-RAR, 2020 WL 2298775, at *10 (S.D. Fla. May 6, 2020). Detained populations also tend to be in poorer health and suffer from a higher prevalence of infectious and chronic diseases than the general population. See Fraihat v. U.S. Immigration and Customs Enforcement, _ F. Supp. 3d _, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570, at *5-6 (C.D. Cal. Apr. 20, 2020).

6. The defendant herein suffers from a thyroid disorder and it is well establish that thyroid disease also is associated with enhanced cases of severe cases of covid-19 infections. It has been cited that "Patients with thyroid disease should hence be advised to take extra precaution to minimize risk exposure to the virus." Further, the defendant's older age, male gender, and presence of multiple comorbities have been identified as the main risk factors for more severe disease and worse outcomes.
See https://www.ncbi.nlm.nih.gov/pmc/articles/pmc7387272/

7. The defendant supplements this instrument with complete medical records, as available, thus verifying, at a minimum, the above cited claims and is a demonstration of clear and compelling evidence that he has met the burden of establishing, again, "extraordinary and compelling" circumstances as established and contained within the previous Docket Entry [50].

8. A recent update by the CDC indicates that "the following health conditions can make adults of any age more likely to get severely ill due to Covid-19: ... chronic lung diseases....diabetes...heart conditions...hypertension...weakened immune system...overweight and obesity, current or former smoking..." noting that all apply to the defendant here and admitting that the defendant smoked

approximately 1.5 packs a day for more than twenty (20) years. See https://cdc.gov/coronoavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

9. Courts around the United States, including this circuit have granted compassionate release to fully vaccinated people. See United States v. Bozon Pappa, 95-cr-84-LENARD (S.D. Fla. April 1, 2021)(granting compassionate release to a woman with obesity and a life sentence); United States v. Hatcher, 18-cr-454-10(KPF)(S.D.N.Y.) (Granting compassionate release to a woman after being fully vaccinated); United States v. Sweet, 2021 WL 1430836, at *3-4 (E.D. Mich. April 15, 2021)(Granting compassionate release to a violent defendant with chronic condition risk factors to which was fully vaccinated, noting the "break through" infections in the state and risk from covid-19 reinfection); United States v. White, 2021 WL 268719, at *4 (M.D. Tenn. Jan. 27, 2021) (Granting release and noting the new Covid-19 variants can evade vaccine-induced immunity).

As is becoming evident, no vaccine is 100% protective and people are getting Covid-19 despite being fully vaccinated. Although Moderna vaccines report a very high efficacy rating, "most experts believe protection ranges widely, from 50 to 80%, depending on the length of time after the shot and the individual variation that exists with any vaccine."; See https://www.washingtonpost.com/health/how-did-that-happen-catching-covid-19-even-after-being-vaccinated/2021/04/23/a31983a6-a21b-11eb-a7747b47ceb36ee8_story.html (Steven Findlay, "How did that happen?" Catching Covid-19 Even After Being Vaccinated, the Washington Post) (April 26, 2021). Further, as has come apparent in the recent weeks, there have been many "break through cases" that have evaded the vaccine and further caused severe symptoms, including death. On July 30, 2021 there were 164,200,000 fully vaccinated people in the United States. Of these 164 million people, there were 125,682 break through cases. Of these 125,682 cases, 1,400 died. See https://www.nbcnews.com/news/amp/ncna1275500/.

10. We now live in a world and pandemic with multiple variants of the Covid-19 virus. Per the CDC, "these variants seem to spread more easily and quickly than other variants, which may lead to more cases of Covid-19"; see https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html. In the current institutional setting, the defendant, with multiple cormorbities is at an all-time, extreme-risk, for contracting both Covid-19 and having a severe reaction of the same, and potential death. Not only does the institutional environment play a large factor into the defendant's circumstance, but in fact, a White House report has stated that Georgia, the state where the defendant is located, is among the ten (10) worst states in almost every metric for Covid-19. See https://www.11alive.com/amp/article/news/health/coronavirus/coronavirus-numbers/georgia-covid-task-force-report--states-metrics-among-us-worst/85-89a52501-d0b0-4aeb-91f2-9bd94ee4facd. Further, and in consideration of the Delta variant, amongst others, the CDC's latest research shows that vaccine effectiveness has dropped from 91% prior to the Delta variant, to 66% effective, in a study ending August 14, 2021. Further,

(5)

experts now say that "vaccinated people need to mask up, they need to do everything they can. Make believe that there wasn't a vaccine." Dr. Eric Topol, professor of molecular medicine and Vice President at Scripps Research Institute. See https://www.usatoday.com/story/news/health/2021/08/24/covid-vaccine-efficacy-delta-variant-cdc-study-los-angeles/5578703001.

11. Specifically citing Jesup FSL, the defendant's current institution, and as of August 23, 2021, the institution has now been reported as the highest possible risk category, Level 3 Operations-Intense Modification, commonly referred to as "RED". See https://www.bop.gov.

It is well established both herein, and as previously filed, that the defendant meets the extraordinary and compelling prong of his Motion For Compassionate Release. Based on his age, 67 years old, his critical medical issues to which are well documented, and his immune suppression because of the same, there can be no question that he is of the highest possible risk unlike other inmates situated around him.

B. DISPARITY IN SENTENCING AND RELATING CASE FACTORS FAVORING RELEASE

1. The defendant presents a unique circumstance to this court that has not been ripe for adjudication and or brought to the court's attention in previous matters, inclusive thereof his actual original sentencing. It is quite possible that the defendant could have argued for a variance and or downward departure in the realm of the actual facts of his case at sentencing and the specific characteristics of the defendant to which will be explained herein. See United States Sentencing Guidelines, Section 5K2.0, (Grounds for Departure); See also 5K2.16, (Voluntary Disclosure of Offense)(Policy Statement) in reference to the following considerations and facts thereof.

- On or about November 14, 2013, a Special Agent with Homeland Security Investigations applied for a federal search warrant to the residence of the defendant in connection with a believed Title 18, U.S.C. 2252(a) violation. On or about November 15, 2013, the warrant was executed at his residence. Upon serving the warrant, the defendant was home, alone, and immediately cooperated with the investigation, allowing access to his computers and equipment to which was sought. This is not unique, and it further substantiated the eventual U.S.C 2252(a) beliefs predicated in the search warrant.

What is unique in this situation is the level of cooperation and most importantly, and while assisting the investigators, the defendant herein both openly admitted to a completely separate crime entirely, and further provided proof of this crime via electronic means. This secondary crime, not encompassed within the beliefs and or search warrant suspicions, is as cited and charged within Count 2 of the criminal indictment. Without the open admission, and further without the physical evidence to which the defendant provided, it is severely likely that such crime would have gone undiscovered to the government, thus in effect,

(6)

causing an eventual sentence of approximately sixty (60) months rather than the two hundred thirty five (235) to which he received. This comparison in theoretical sentencing is based in retrospect to what the defendant was eventually sentenced to in the instant matter, noting a bottom of the guidelines sentence. On it's face, and without a careful review of the facts, it may appear that the government would have eventually discovered the additional crimes, it is however extremely unlikely due to the hidden location of a thumb drive to which contained the video(s) in question relevant to Count (2). Second to this, and equally ripe for consideration, is the date of the video as it was created more than five (5) years prior. Further there were no subsequent videos and or similar conduct, to which is a credible claim of the defendant due to the voluntary admission and proof(s) thereof relating to this Count 2 offense. More damning yet, is the fact that the vast majority of the finding(s) (to which also enhanced Count 5) during this search were at the direction of the defendant specifically, and located under floor boards in the attic of his home to where they never could have been located otherwise.

In effect, the defendant, due to guilt, remorse, and understanding of his incredibly severe crimes, proffered himself to the investigators and created what he believed to be a clean slate in his life. He believed that by telling the truth, by explaining the age of the video and its long past, his misgivings and further handing over the entirety of the situation to the investigators, that such would benefit him. This immediate cooperation essentially increased his sentence by nearly 300%; however, he himself, in effect, caused the sentence to which he received both literally by means of the commission of the crime, and further directly, by means of volunteering the unknown information about the crime and evidence as cited in Count 2 (and enhanced in Count 5), that would not have been discovered due to the location(s) of the hidden media. In summary, the defendant handed himself to the mercy of the court and investigation with little to no care of the outcome due to his remorse and comprehension of his tragic conduct. He immediately accepted responsibility, sought treatment, and further accepted the situation to which he alone placed himself in. The crime as cited in Count 2 was completely unknown prior to the defendant explaining and proffering the above said evidence; at no time was this presented in this light for consideration by the district court either in a 3553(a) and or any relevant variance or downward departure motions to which may have been applicable. It now becomes applicable herein due to the nature and considerations of the defendant and information as briefed within the record and this instrument.

This circumstance is extremely rare and should be considered under 5K2.0(2)(A)&(B) and 5K2.16. Likewise, had the defendant simply kept quiet, it is likely he would be home now reintegrated in society and without the present risk factors of death to which he faces daily. See United States v. Todd, [D.E. 1](M.D. Fla. 2014). Many similar situated defendants have received variances in connection to these cases

(7)

inherently, per the Department of Justice. While the defendant, nor counsel apparently, requested a variance, the fact that he did not receive one is still is ripe for consideration within this instrument when comparing the eventually prescribed sentence and the amount of time that the defendant was ordered to serve. When comprised with his current health, his age, the pandemic, and the nearly 50% of the sentence to which the defendant has presently served, it still may very well become a life sentence to which causes an extreme disparity in sentencing amongst similarly situated defendants. See United States v. Blackwell, 18-cr-138 (Distr. of Minn., Oct. 2018)(Variance from 292 Months to 214 months); See also United States v. Carrier, 17-cr-60052 (S.D. Fla.)(360 reduced to 280); See also United States v. Dominguez, 18-cr-20839 (S.D. Fla.)(360 reduced to 240); See also United States v. Roberts, 19-cr-15 (N.D. Fla.)(840 reduced to 360); See also United States v. Orr, 15-cr-67 (M.D. Fla. Apr. 27 2016)(188 months reduced to 180 months by Honorable Brian J. Davis).

2. The defendant proffers to this court the findings as cited within United States v. Sweet, 07-20369 (E.D. Mich. April 15, 2021), to which the district court GRANTED a pro se motion of Compassionate Release to an inmate serving a term of two hundred and sixty two (262) month sentence for similar conduct. Not only is it noteworthy the similar conduct, but in fact the defendant argues the history of Sweet and conjunction to this instant matter. In Sweet, he was charged in state court for homicide-murder & convicted on his plea of 2nd degree murder, enacting a state sentence of 15-30 years in prison. Secondarily, in state court, Sweet was sentenced to 10-17 years for criminal sexual conduct, 1st degree. And finally, in federal court, Sweet pled guilty to four counts of Sexual Exploitation of Children in violation of 18 U.S.C. 2251(a), and one count in violation of 18 U.S.C. 2252(a)(2) to which caused his current incarceration within the Bureau of Prisons. His eventual release date was scheduled to be December 22, 2037. Sweet met the guidelines, apparently, due to his age and medical conditions, as well as the prong associated with the associated 3553(a) factors, thus favoring release.

The defendant herein reflects to his own criminal history in which he has none. He additionally points the court back to his medical history to which is far more severe and in advance of Sweet, thus clearly establishing a severe disparity in similar situated instant crimes. The defendant, like Sweet, has no disciplinary actions, thus is equally representing a respect for the law and is a clear foreshadow to how he likely will perform on Supervised Release. See United States v. Yu, 90-CR-47-6, 2020 US Dist. LEXIS 220458 (S.D.N.Y. 11/23/20); See also U.S v. Hagan 17CR210-BJD-JBT.

3. The defendant further points this court towards several other similarly situated inmates to which received, in many cases, substantially less of a sentence and further, in several cases, had prior criminal history to which the defendant herein does not. See United States v. Holmes, No. 14-11137. 814 F.3d 1246; 2016 U.S. App. LEXIS 3279; 26 Fla. L. Weekly Fed. C 85 (11th Cir. Feb. 25, 2016)(Sentenced to 180 months); See also United States v. Orr, No. 18-11633. 819 Fed. Appx. 756; 2020 U.S. App. LEXIS 20498 (11th Cir. July 1, 2020)(Sentenced to 180 Months); See also United States v. Gamez, No. 12-60982. 553 Fed. Appx. 430; 2014 U.S. App. LEXIS 1961 (5th Cir. Jan. 2014)(Sentenced to 120 months); See also United States v. Fee, No. 11-15356. 491 Fed. Appx. 151; 2012 U.S.App. LEXIS 20704 (11th Cir. Oct. 2012)(Sentenced to 180 months); See also United States v. Ray, No. 10-30382. 425 Fed. Appx. 340; 2011 U.S. App. LEXIS 9814 (5th Cir. May 13, 2011)(Sentenced to 180 months); See also United States v. Deal, 3:12-cv-1383-J-32JRK, 3:08-cr-368-J-JRK, 2015 U.S. LEXIS 54801 (M.D. Fla. Apr. 27, 2015)(Sentenced to 180 months); See Also United States v. Traweek, No. 16-20481. 707 Fed. Appx. 213; 2017 U.S. App. LEXIS 16134 (5th Cir. Aug. 23, 2017)(Sentenced to 180 months); See also United States v. Dorman, 12-cr-370-T-24EAJ(M.D. Fla. July 1, 2014)(Sentenced to 192 months, noting however that this was an extreme case in that Dorman was involved in an actual sexual relationship and further was supplying methamphetamine and marijuana to the victim).

While the defendant again reiterates his very serious conduct and the effects of the same in relation to his offense(s), he further directs the court to the average sentences to which the similar situated defendants have received as noted above. It is apparent that the average sentence is approximately one hundred eighty (180) months for similarly situated crimes, notably substantially less than what the defendant herein received, and such is applicable in this instant matter via the realm of disparity. While the time to argue a variance and or even disparity is technically long past, it is ripe for consideration within the realm of this instrument hereby requesting compassionate release and in conjunction additionally to the 3553(a) factors as will be discussed equally herein that are specific to Mr. Todd.

## C. SECTION 3553(a) FACTORS WARRANTING RELEASE

1. On or about December 19, 2013, the defendant, John Dewey Todd, underwent an exhaustive "Psychological / Psychosexual Evaluation" with Dr. Harry D. Krop, Psychologist and Director of Community Behavioral Services located in Gainesville, Florida. (352-372-6645 / combehserv@gmail.com) Dr. Krop is a board licensed Psychologist. His resume is attached herein as an exhibit and speaks clearly for itself, though his education and past highlights including Ph.D and M.S. both from the University of Miami, Clinical psychology, 1971 & 1967 and titles as Courtesy Associate Professor at the University of Florida College of Medicine and Staff Psychologist for the Veterans Administration among many others. He further has substantial experience testifying in both civil and criminal proceedings in the realm of forensic evaluations. Further, Dr. Krop has a long history in dealing in the exact nature of the defendant in the realm of child sexual abuse. The record is clear that he is a trusted authority and has more than forty (40) years experience in the matters at hand.

First off, Dr. Krop validates many of the medical circumstances herein & independently of any BOP and or otherwise records that have been submitted. The results of the analysis are crystal clear - and defined in detail by Dr. Krop. "The results of the psychological testing are inconsistent with any significant psychopathology." Further, "He has the capacity to empathize with victims of abuse of any type and, most importantly, the results of the testing are inconsistent with psychopathic or anti-social traits". Finally, Dr. Krop cites specifically that "Based on the totality of this evaluation, it is the examiner's opinion that Mr. Todd presents a low risk to engage in sexual misconduct." and "...Mr. Todd recognizes his need for professional intervention and appears highly motivated to gain an understanding as to the dynamics which led to the current allegations and arrest for a sexual offense". Finally, Dr. Krop cites also specifically that "...I do not view Mr. Todd as a risk to engage in sexually deviant behavior if he is released into the community and I would anticipate that he would comply with any Court Ordered sanctions/conditions. I also anticipate that Mr. Todd would be an active participant in treatment and benefit from continuous involvement in a treatment program".

The Bureau of Prisons, at least as located at Jesup, Georgia, does not offer any type of Sex Offender treatment whatsoever. Prior to his arrest, and of the defendant's own accord, he was enrolled in a sex

offender specific treatment program in Orange Park. His eventual arrest prevented the continuation of this program. Upon the defendant's release, in whatever manner that becomes, the defendant desires to re-enter the treatment in which he independently sought to insure his future success. The mere fact of the acknowledgement and desire of such treatment goes beyond the showing of remorse and the initiative to which promotes positive release factors. See United States v. Frushour, No. 16.20226-1, 2020 WL 4734907, at *3 (E.D. Mich. Aug. 14, 2020)(Granting compassionate release in respect to the inability for specific treatment he not only required, but in fact sought out of his own accord); see also United States v. Hagan, 3:17-CR-210-BJD-JBT, 2021 U.S. Dist. LEXIS 70141 (M.D. Fla. Apr. 12, 2021)(Notably a decision by this actual court and Honorable Brian J. Davis)(Citing specifically Hagan's desire for rehabilitation)

2. In support of the statements and findings above by Dr. Krop, the same is essentially validated by the Administrative Office of U.S. Courts, from the Probation and Pre-trial Services Office specifically in finding the following:
    a. - Only 3% had a high risk assessment;
    b. - Only 2.6% had any sex related arrest after conviction;
   This is derived from the Federal Supervision report of September 2016, specifically for Sex Offenders.

3. Additional support of Dr. Krop and the Administrative Office of U.S. Courts is validated by Faust E., Bickert, Renaud C., and Camp, S. (2015) in a multi-level comparison of demographics and rates of recidivism. Their findings conclude similar results, citing that only 1.6% of child pornography possessors and child contact sex offenders committed a new offense.

4. In respect to the sentence and considerations of similarly situated defendants at sentencing, it should be highlighted that 61.2% of all related cases received a below the Guidelines range sentence, and such encompassed an average reduction of 40.1%, at sentencing. See U.S.S.C. Quick facts of child pornography offenses fiscal year 2018. https://www.ussc.gov/sites/default/files/pdf/research-and-publication/quick-facts/child_pornography_fy18.pdf. It is reiterated that the defendant received no such variance and or departure and further that the defendant voluntarily advised the government of his additional unknown crimes and equally supplied the evidence that assisted the government generate his nearly twenty (20) year sentence at his age of sixty (60) years; essentially a life sentence in the case of this defendant and quite possibly literally a life sentence due to the pandemic in the event of the defendant acquiring Covid-19.

5. It is noteworthy that Congress did not write child pornography offenders out of the Compassionate Release statute, nor exempt prisoners serving a mandatory minimum sentence of imprisonment from the ability to seek compassionate release. See United States v. Millete, 26-CR-4 (D. Me., Dec. 21, 2020); see also United States v. Hagan, 3:17-cr-210-BJD-JBT, (M.D. Fla. Apr. 12, 2021)

6. As the Chief Judge in the Fourth Circuit recently said, "Section 3582(c)(1) necessarily envisions that the 3553(a) factors may balance upon a motion for compassionate release than they did at the initial sentencing. An individual requesting compassionate release will, in all cases, be serving a sentence that a district court once held was sufficient but not greater than necessary. If a district court's original 3553(a) analysis could always prove that a sentence reduction would intolerably undermine the 3553(a) factors, the 18. U.S.C. 3582(c)(1) would, in effect, be a nullity." The conditions and risk, due to the pandemic specifically, have drastically changed everything about a inmates sentence and the severity of the same. In the case of the defendant, not only are the conditions substantially worse that originally prescribed, but in fact, the defendant faces live or death risks daily in respect to the Covid-19 virus. Although the citing is from the Forth Circuit, the principle in effect is exactly the same anywhere in the country, inclusive of the 11th Circuit to where the defendant herein was sentenced.

7. In the event the court grants the defendant's motion for compassionate release herein, it is assumed and expected that a modified and or enhanced term of supervised release may be encompassed, including at a minimum, a Special Condition of home confinement amongst any other previously issued Special Conditions to which are applicable to the defendant. It is well established that "home confinement ...is also a form of punishment", see United States v. Telson, 16-CR-80178 (S.D. Fla. Sept. 21, 2020); See also United States v. Minnis, (S.D. Fla. jan. 14, 2021), (the court noted that the defendant had only served 14 months of his 46 month sentence and found that this weighs appropriately against reducing his sentence, as does the fact that reducing his sentence would create a disparity with his co-defendants whom the court found deserving of lower sentences than the defendant. However, the fact that the court Court can (and should) place the defendant on a special term of supervised release for the remainder of his sentence, with a special condition requiring home confinement, provides the court with the option to continue providing punishment, deterrence, and protection of the public while mitigating the risk of severe illness. Moreover, to the extent that the defendant's sentence no longer would reflect a more severe punishment than less-culpable co-defendants, the disparity in their

respective medical conditions drives that result. As such, the court granted compassionate release finding that the 3553(a) factors warranted the same.)

8. It also should be noted that the United States Attorney's Office did not proffer an objection to the defendant's previous Motion for Compassionate Release, [D.E. 50].

9. The defendant has a MINIMUM PATTERN SCORE, inclusive of a MINIMUM VIOLENT SCORE by the Bureau of Prisons, indicating a "MINIMUM" risk of recidivism - the lowest level of recidivism risk. The defendant also has minimum classification points, further recommending a "decrease" in his current classification.

10. The defendant has 112 months remaining, (47.6%), of the 235. Substantially moreso served than his previous denied filing for compassionate release. This is independently a material change in of itself and substantial when viewing the comparable above cited cases in respect to the current pandemic and risks thereof to the defendant.

11. The defendant has a suitable release plan in place, consisting of family support and further has a pension from his life's work and will also obtain his earned social security payments. This will allow the defendant to re-enter society, at a level perhaps confortable and controlled by this court. The defendant further intends to take control of the care of his father to which has been now placed within a assisted living center. This placement occured after the prior denial of compassionate release as the defendant's family had no other alternative in providing this critical care that the defendant may provide if released. The defendant's family shall obtain a probation suitable rental property and or make living arrangements upon a granted motion.

## III. CONCLUSION

WHEREFORE, the defendant, John Dewey Todd, hereby requests that this Court GRANT this instrument, as drafted, thus causing the immediate release of the defendant and causing the application of any special conditions that this court should deem required to insure the compliance and requirements under section 3553(a).

August 29, 2021

Respectfully Submitted,

*John Dewey Todd*
John Dewey Todd
#60135-108
FSL Jesup
2680 HWY 301 S.
Jesup, GA 31599